UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MARK MARING, et al.,

        Plaintiffs,

   v.

PG ALASKA CRAB INVESTMENT CO., LLC, et al.,

        Defendants.

CASE NO. C05-326JLR

ORDER

## I. INTRODUCTION

This matter comes before the court on a motion for summary judgment from Plaintiff Mark Maring and a collection of corporate entity Plaintiffs. (Dkt. # 13). Although Mr. Maring has requested oral argument, the court finds this motion appropriate for disposition on the basis of the parties' briefing and accompanying declarations. For the reasons stated below, the court DENIES Mr. Maring's motion.

## II. BACKGROUND

Mr. Maring is the principal in a network of corporate entities engaged in commercial fishing in the Pacific Ocean. Although Mr. Maring and those entities are Plaintiffs here, the court will refer to Plaintiffs as "Mr. Maring" unless a distinction is important. In 2000, Mr. Maring obtained a loan (or a series of loans) from Defendant PG Alaska Crab Investment Co., LLC ("PGA") to finance his fishing enterprise. Although

ORDER – 1

the parties dispute the amount and terms of the loan, it was for more than $4,000,000 at an interest rate of at least 12 percent. Mr. Maring defaulted on the loan in late 2001.

In 2004, the parties began discussions about an agreement to settle the unpaid loan balance. The discussions cumulated on January 11, 2005 with a Settlement Agreement. The Settlement Agreement required Mr. Maring to transfer to PGA a $7.4 million payment he received from the sale of two of his vessels to the National Marine Fisheries Service's ("NMFS") Vessel Buyback Program. It also required that Mr. Maring deliver all of his Alaska fishing permits and supporting documentation to PGA, including his interest in a Processing Quota Share ("PQS") permit for his NORTHLAND vessel. Mr. Maring petitioned the United States government for a hardship exception that would allow the NORTHLAND to participate in crab fishing with a PQS permit. Mr. Maring's representations about the PQS permit and PGA's understanding of the permit's status are the subject of pointed disputes between the parties. Upon performance of Mr. Maring's obligations, the Settlement Agreement required PGA to pay Mr. Maring $275,000 and to release liens on some of Mr. Maring's vessels.

PGA has undisputedly not performed its duties under the Settlement Agreement. PGA contends that its performance is excused for two reasons: Mr. Maring did not satisfactorily perform his part of the Settlement Agreement; and Mr. Maring and his agents improperly induced PGA to enter the Settlement Agreement by misrepresenting the status and value of the NORTHLAND PQS permit.

Mr. Maring brings this summary judgment motion seeking summary adjudication of PGA's liability under the Settlement Agreement. He also moves for summary judgment against PGA's counterclaims for fraud, negligent misrepresentation, reformation of the Settlement Agreement, and declaratory judgment.

ORDER – 2

### III.  ANALYSIS

In examining Mr. Maring's summary judgment motion, the court must draw all inferences from the admissible evidence in the light most favorable to the non-moving party.  Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).  Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden to demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met its burden, the opposing party must show that there is a genuine issue of fact.  Matsushita Elect. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  The opposing party must present significant and probative evidence to support its claim or defense.  Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).  Where a question presented is purely legal, summary judgment is appropriate without deference to the non-moving party.

**A.  Disputed Facts Prevent the Court from Entering Summary Judgment Against PGA's Counterclaims.**

PGA challenges the underpinnings of the Settlement Agreement in its counterclaims for fraud, negligent misrepresentation, and reformation.[1]  All three counterclaims arise from PGA's contention that Mr. Maring and his agents misrepresented the status and value of the NORTHLAND PQS permit.

 Mr. Maring's alleged misrepresentations regarding the NORTHLAND PQS permit are a common element in each of PGA's counterclaims.  A party claiming fraud or negligent misrepresentation must prove that the opposing party made a false

---

[1] The court reserves a discussion of PGA's declaratory judgment, breach of contract, and breach of the covenant of good faith and fair dealing counterclaims for the end of this order.

ORDER – 3

representation of material fact. Guarino v. Interactive Objects, Inc., 86 P.3d 1175, 1191-93 (Wash. Ct. App. 2004). Similarly, a claim for contract reformation requires either a mutual mistake or one party's mistake coupled with inequitable conduct by the other party. Denaxas v. Sandstone Court of Bellevue, LLC, 63 P.3d 125, 132 (Wash. 2003).

PGA offers evidence to demonstrate that Mr. Maring misrepresented the status and value of the NORTHLAND PQS permit. According to James Paduano, a managing member of PGA, Mr. Maring either stated or implied during settlement negotiations that he had successfully lobbied the North Pacific Fishery Management Council to grant the NORTHLAND a PQS permit. Paduano Decl. ¶ 32. Mr. Maring repeatedly represented to PGA that his lobbyist obtained specific regulatory language that entitled the NORTHLAND to a PQS permit. Id. Mr. Paduano claims that Mr. Maring led PGA to believe that the permit either existed or would soon exist. According to Charles Greenburg, another PGA member, Mr. Maring bolstered PGA's impression that the NORTHLAND PQS permit existed when he introduced an "Orion Group Asset List" in July 2004 that set the value of the NORTHLAND PQS permit at $2.5 million. Greenberg Decl. ¶ 12, Ex. A. Mark Calvert and Ron Graves, two individuals who helped Mr. Maring prepare valuations of his various assets,[2] valued the NORTHLAND PQS permit at a minimum of $500,000 and as much as $2,500,000. Greenberg Decl. ¶¶ 5, 7, 12; Paduano Decl. ¶ 31. At a January 7, 2005 meeting, Mr. Anderson, another advisor to Mr. Maring, stated to Mr. Paduano that Mr. Maring was willing to give up his "most valuable" fishing permit, the NORTHLAND PQS. Id. at ¶ 30; Greenberg Decl. ¶ 7. Mr. Paduano and Mr. Greenberg both aver that they concluded that the NORTHLAND PQS

---

[2]The parties dispute whether Mr. Graves and Mr. Calvert were acting on Mr. Maring's behalf in settlement negotiations, but the court cannot resolve the conflicting evidence. At this stage, the court assumes (as it must) that Mr. Graves and Mr. Calvert were Mr. Maring's agents.

ORDER – 4

permit was either in Mr. Maring's possession or was certain to be in his possession shortly. Paduano Decl. ¶ 32; Greenberg Decl. ¶ 7. PGA asserts that it was not until January 28, 2005, when Jack Cullen, counsel for Mr. Maring, notified them that the NORTHLAND PQS permit was not deliverable, that it discovered that the permit did not exist. Paduano Decl. ¶ 36; Greenberg Decl. ¶ 8.

Mr. Maring, on the other hand, asserts that PGA knew that he did not have the NORTHLAND PQS permit and that his projections that he would obtain it were speculative. From 2001 to the January 2005 conference, Mr. Maring repeatedly apprised PGA of his lobbying efforts to secure a PQS permit. Maring Decl. ¶ 27. For example, on November 4, 2004, Mr. Maring sent an email to Mr. Paduano containing a link to the proposed rule that would implement the PQS program. Id. While Mr. Maring admits that he told PGA that he was confident that the NORTHLAND would obtain a PQS permit, he denies telling PGA that he actually had a permit. Id. at ¶ 28. In several discussions with Mr. Paduano, Mr. Maring estimated the value of a PQS permit, assuming the NORTHLAND qualified for one, to be between zero and over $2 million, based on his best guess. Id. He claims that on January 3, 2005 and January 12, 2005, he gave PGA documents describing the status of the PQS permit, including a summary of the NORTHLAND's processing history for the years 1990-1997. Id. at ¶ 29. Mr. Maring contends that these documents show that he did not possess a PQS permit. Id. Mr. Calvert, for his part, denies discussing the NORTHLAND PQS permit at a January 7, 2005 meeting with PGA. Calvert Decl. ¶ 17. Mr. Cullen also disputes PGA's assertion that the parties discussed the PQS permit during the January 7, 2005 settlement meeting. Cullen Decl. ¶ 9.

The disputes over the NORTHLAND PQS permit prevent the court from entering summary judgment against PGA's counterclaims. The court cannot resolve the

ORDER – 5

counterclaims without first resolving the conflicting evidence regarding Mr. Maring's representations about the NORTHLAND PQS permit in the negotiations leading to settlement. The court cannot resolve the conflicting evidence on a motion for summary judgment.

**B.  Factual Disputes Also Prevent the Court From Entering Summary Judgment on PGA's Liability Under the Settlement Agreement.**

In addition to the dispute over the PQS permit, the parties dispute whether the Settlement Agreement establishes conditions precedent to PGA's performance, and whether Mr. Maring complied with these conditions. As a threshold matter, the court notes that PGA's counterclaims raise questions about whether the Settlement Agreement can be enforced on its existing terms. The court assumes that it is enforceable for purposes of this motion.

**1.  The Settlement Agreement Imposes Conditions Precedent on Mr. Maring.**

The Settlement Agreement establishes an order of performance of the parties' obligations:

> The Parties shall cooperate in good faith to prepare and execute final documentation setting forth the settlement agreement consistent with this Agreement, *so long as the conditions set forth in ¶ 3, below, are fully performed by the specified deadlines*. . . . The parties contemplate closing to occur on or before January 24, 2005.

Agreement ¶ 2 (emphasis supplied). Paragraph 3 of the Agreement establishes conditions that Mr. Maring must perform. It requires that Mr. Maring transfer to PGA the $7.4 million in proceeds resulting from the sale of two vessels in NMFS' Vessel Buyback Program, relinquish all interest of any kind in Alaska fishing permits to PGA, and execute an irrevocable power of attorney allowing PGA to execute all documents related to the Alaska fishing permits. Agreement ¶ 3.

ORDER – 6

The court holds as a matter of law that the conditions in paragraph 3 of the Settlement Agreement are conditions precedent to PGA's performance. Where contract terms are unambiguous, the court can interpret the contract as a matter of law. Absher Constr. Co. v. Kent School Dist. No. 415, 890 P.2d 1071, 1073 (Wash. Ct. App. 1995). Under the Agreement, the critical aspects of PGA's performance need not occur until "Closing," "as part of the final documentation at Closing," and after Mr. Maring has "complied fully with all obligations." Agreement ¶¶ 5-7. While the Agreement does not define the term "Closing," its meaning is clear. An examination of the other contract provisions indicates that "Closing" is synonymous with the date of execution of final documentation. Mr. Maring's performance of the conditions in paragraph 3, however, must occur before closing. As paragraph 3 imposes conditions precedent on Mr. Maring as a matter of law, PGA had no obligations under the Settlement Agreement unless Mr. Maring performed his obligations first.

**2. Disputed Facts Prevent the Court from Determining if Mr. Maring Complied with the Conditions Precedent.**

The court focuses on two of the conditions precedent: Mr. Maring's obligation to transfer proceeds of the sale of two vessels to PGA, and Mr. Maring's obligation to disclose information about his existing fishing permits.

**a. Mr. Maring Complied with the Condition Precedent Requiring Transfer of Proceeds from the Sale of His Vessels**.

The Settlement Agreement requires Mr. Maring to transfer $7.4 million in vessel sale proceeds to PGA. Agreement ¶ 3.a. The parties do not dispute that Mr. Maring delivered the tender of payment documents in a timely manner, and that he did not complete the portion of the documents requiring information on the payee. The parties dispute whether PGA instructed Mr. Maring to leave the payee section blank. Mr. Maring alleges that "[he] did not complete that portion of the documents indicating the

ORDER – 7

payee as PG Alaska had previously indicated that it may wish to have the payments or a portion thereof directed to an affiliate entity." Maring Decl. ¶ 19. PGA "categorically denies instructing Mr. Maring to leave the payee section of these documents blank." Paduano Decl. ¶ 35a.

The court finds that, even taking the facts in the light most favorable to PGA, Mr. Maring transferred the vessel sale proceeds as contemplated in the Settlement Agreement. PGA admits that despite the alleged defects in Mr. Maring's performance, it was able to complete the tender of payment documents, submit them to NMFS, and collect the buyback proceeds. Defs.' Countercl. ¶ 3.26(a). Under Washington contract law, only a material breach gives the injured party the right to withhold further performance. Bailie Comms., Ltd. v. Trend Bus. Sys., 765 P.2d 339, 342 (Wash. Ct. App. 1988) (citing Restatement (Second) of Contracts § 241). Determining whether a breach is material involves an examination of the following five factors:

> (1) whether the breach deprives the injured party of a benefit which he reasonably expected, (2) whether the injured party can be adequately compensated for the part of that benefit which he will be deprived, (3) whether the breaching party will suffer a forfeiture by the injured party's withholding of performance, (4) whether the breaching party is likely to cure his breach, and (5) whether the breach comports with good faith and fair dealing.

Id. at 343. While a portion of the transfer documentation was incomplete, PGA was able to successfully receive the buyback proceeds. Therefore, PGA suffered no injury. The court finds that Mr. Maring did not materially breach this condition of the Settlement Agreement.

### b. Factual Disputes Prevent the Court From Deciding if Mr. Maring Performed His Obligation to Disclose Fishing Permit Information.

The Settlement Agreement also requires that Mr. Maring deliver by January 12, 2005 "all interests of any kind . . . in Alaska fishing permits of any kind, . . . along with

ORDER – 8

all documentary history . . . and together with a summary chart . . . . " Agreement ¶ 3.b. Mr. Maring admits that he delivered a portion of the documentary history approximately two weeks late, but he argues that the late submission does not constitute a breach because the Agreement allows for a rolling production of documents and PGA explicitly authorized that manner of production. Agreement ¶ 3.b (stating that for documents that are unavailable, "Maring shall provide an explanation of the circumstances of the unavailability and shall cooperate fully to locate and provide all such documentation."). PGA asserts that Mr. Maring did not submit a list of unavailable documents or an explanation of the circumstances of their unavailability. Kornfeld Decl. ¶ 10. PGA denies authorizing a rolling production of documents. Id. at ¶ 8. PGA claims that the delay in document production hindered the discovery of the problems associated with the NORTHLAND PQS permit. Greenberg Decl. ¶ 9-10.

Taking these disputed facts in the light most favorable to PGA, the late delivery of documentation constitutes a material breach. Paragraph 9 of the Settlement Agreement contains a "time is of the essence" clause applicable to every obligation in the Agreement. Agreement ¶ 9. This provision evidences a mutual intent that there be strict enforcement of specified times of performance. Mid-Town Ltd. P'ship v. Preston, 848 P.2d 1268, 1272 (Wash. Ct. App. 1993). When a party does not perform or excuse a condition precedent within the time required, both parties' contractual duties are discharged. CHG Int'l v. Robin Lee, Inc., 667 P.2d 1127, 1129 (Wash. Ct. App. 1983). The court cannot resolve Mr. Maring's contention that PGA waived timely performance, because PGA has offered evidence indicating that it did not do so. Kornfeld Decl. ¶ 8.

Because the court cannot determine as a matter of law if Mr. Maring complied with the Settlement Agreement's conditions precedent, the court cannot grant summary judgment on PGA's liability on the contract.

ORDER – 9

**C.     The Court Cannot Grant Summary Judgment on PGA's Remaining Counterclaims.**

Finally, the court turns to PGA's declaratory judgment, breach of contract, and breach of the covenant of good faith and fair dealing. Each counterclaim depends on the resolution of the disputed facts the court has discussed above. For that reason, the court denies Mr. Maring's motion for summary judgment on these counterclaims.

## IV.  CONCLUSION

For the reasons stated above, the court DENIES Mr. Maring's motion for summary judgment. (Dkt. # 13).

Dated this 22nd day of July, 2005.

_____
JAMES L. ROBART
United States District Judge

ORDER – 10