1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MARK MARING, et al.,

            Plaintiffs,

    v.

PG ALASKA CRAB INVESTMENT CO.,
LLC, et al.,

            Defendants.

CASE NO. C05-326JLR

ORDER

## I.  INTRODUCTION

This matter comes before the court on a motion for summary judgment from Counterclaim Defendants Mark Calvert and Cascade Capital Group, LLC (Dkt. # 64). No party has requested oral argument, and the court finds this motion appropriate for disposition on the basis of the parties' briefing and accompanying declarations.  For the reasons stated below, the court GRANTS the motion and dismisses all counterclaims against Mr. Calvert and Cascade Capital Group.

## II.  BACKGROUND

This action centers around a dispute between Plaintiff Mark Maring and Defendant PG Alaska Crab Investment Co. ("PG Alaska").  The court summarized that dispute in a prior order denying summary judgment (Dkt. # 35), and will not repeat its discussion here.

ORDER – 1

The instant motion concerns a subsidiary dispute between PG Alaska and Mark Calvert, the principal (and perhaps sole) officer of Cascade Capital Group, LLC ("CCG"). Taking the facts in the light most favorable to PG Alaska, Mr. Maring hired Mr. Calvert to assist him with valuing the multiple corporate entities and assets in Mr. Maring's commercial fishing enterprise. Mr. Maring hired Mr. Calvert to present a consolidated estimate of the value of his enterprise to help Mr. Maring negotiate a settlement with PG Alaska of a loan upon which he had defaulted. Based on information he received from Mr. Maring and permit and vessel valuation expert Ron Graves, Mr. Calvert provided valuation services, and submitted a draft estimate of the value of Mr. Maring's enterprise, including a valuation of several individual assets, to PG Alaska. Based in part on that draft estimate, PG Alaska entered an agreement with Mr. Maring to settle their dispute over the defaulted loan. PG Alaska now alleges that Mr. Maring, Mr. Calvert, and others fraudulently or negligently misrepresented facts that induced them to enter the settlement agreement.

Although the parties present a meandering and exhaustive description of Mr. Calvert's role, PG Alaska's claims against Mr. Calvert are based on only one act – Mr. Calvert's "valuation" of a commercial crab fishing permit for Mr. Maring's vessel the NORTHLAND ("Northland PQS"). According to Mr. Calvert, the value of the Northland PQS was between $500,000 and $2,500,000. Calvert Decl. Ex. E. At deposition, Mr. Calvert stated that he had estimated 75% probability that the Northland PQS would sell for more than $500,000, although there is no evidence that he made such a representation to PG Alaska before this litigation commenced. Taking the facts in the light most favorable to PG Alaska, Mr. Calvert was quite wrong about his valuation. The Northland PQS was worth nothing, because Mr. Maring did not actually possess a PQS, and could not obtain one.

ORDER – 2

In this motion, Mr. Calvert contends that PG Alaska cannot prove a fraud or negligent misrepresentation claim against him.

### III.  ANALYSIS

In examining Mr. Calvert's summary judgment motion, the court must draw all inferences from the evidence in the light most favorable to the non-moving party.  Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).  Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden to demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the moving party meets its burden, the opposing party must show that there is a genuine issue of fact.  Matsushita Elect. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  The opposing party must present significant and probative evidence to support its claim or defense.  Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).  For purely legal questions, summary judgment is appropriate without deference to the non-moving party.

**A.     Elements of Fraud and Negligent Misrepresentation**

To prove fraud at trial, PG Alaska would have to present clear, cogent, and convincing evidence of all elements of fraud.  Stiley v. Block, 925 P.2d 194, 204 (Wash. 1996).  The elements of fraud are (1) a representation of an existing fact, (2) materiality of the representation, (3) falsity of the representation, (4) knowledge of the falsity or reckless disregard as to its truth, (5) intent to induce reliance on the representation, (6) ignorance of the falsity, (7) reliance on the truth of the representation, (8) justifiable reliance, and (9) resulting damages.  Farrell v. Score, 411 P.2d 146, 148 (Wash. 1966).

A plaintiff alleging negligent misrepresentation must also prove all elements of the tort by clear and convincing evidence.  Havens v. C&D Plastics, Inc., 876 P.2d 435, 447

ORDER – 3

(Wash. 1994).  A plaintiff must prove (1) that the defendant supplied information for the guidance of others in their business transactions that was false, (2) that the defendant knew or should have known that the information was supplied to guide the plaintiff in business transactions, (3) that the defendant was negligent in obtaining or communicating false information, (4) that the plaintiff relied on the false information supplied by the defendant, (5) that the plaintiff's reliance on the false information was reasonable under the surrounding circumstances, and (6) that the false information was the proximate cause of damages to the plaintiff.  Lawyers Title Ins. Corp. v. Baik, 55 P.3d 619, 624 (Wash. 2002).  Because the court must view evidence presented on summary judgment "through the prism of the substantive evidentiary burden," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986), a defendant seeking summary judgment on fraud or negligent misrepresentation must prove that no reasonable factfinder could find that the plaintiff has proven each element by clear, cogent, and convincing evidence.

To prove either fraud or negligent misrepresentation, PG Alaska would have to offer evidence that it relied on a representation from Mr. Calvert, and that its reliance was reasonable.  The only representation that PG Alaska points to as a cause of damage, however, is Mr. Calvert's valuation of the Northland PQS permit at between $500,000 and $2,500,000.  PG Alaska contends that the statement is false because Mr. Calvert should have disclosed that the Northland PQS permit could be worth nothing, because Mr. Maring had not obtained it.[1]  PG Alaska thus contends that it justifiably relied on Mr. Calvert's (implicit) assertion that Mr. Maring possessed the Northland PQS permit or

---

[1]PG Alaska could prevail on a fraud claim if they could prove that Mr. Calvert knew that Mr. Maring did not have a PQS permit or knew that he could not obtain one, and nonetheless valued the Northland PQS at least $500,000.  The court finds no evidence supporting such an allegation, much less evidence from which a jury could find "clear, cogent, and convincing" proof.

ORDER – 4

qualified for one.  PG Alaska's own evidence, however, establishes conclusively that it did not rely on Mr. Calvert's representations about the existence of the Northland PQS, and that it would have been unreasonable to do so in any event.

**B.    PG Alaska Did Not Rely on Mr. Calvert in Concluding that Mr. Maring Had or Could Obtain a PQS Permit.**

The statements of PG Alaska representatives[2] cast doubt on whether they believed that Mr. Maring had the Northland PQS, as opposed to an expectancy that he would receive the permit.  James Paduano, the managing member of PG Alaska, states that he came to the "reasonable conclusion that the Northland PQS was within, *or about to be in*, Maring's hands."  Paduano Decl. ¶ 32 (emphasis added).  Mr. Maring's qualification for a PQS permit turned on whether he had conducted certain fishing activities in prior years to qualify for a grandfather exception to regulations.  Mr. Paduano states that Mr. Maring had "repeatedly represented" to him that he had lobbied to the North Pacific Fishery Management Council to obtain a regulatory change that would allow him to obtain the Northland PQS.  Id.  Mr. Maring told Mr. Paduano that the regulation "cured all possible defects" in his "qualification for a PQS."  Id.  Similarly, Charles Greenberg, another PG Alaska member who attended settlement negotiations, declared that he had "relied on Mr. Maring's representation that the Northland qualified for a 'grandfathered' [PQS] permit that he specifically lobbied for the Northland's benefit."  Greenberg Decl. at ¶ 7.  Armand Kornfeld, PG Alaska's attorney, states that he understood the Northland PQS was a "processing quota share permit that the Northland *was entitled to have issued*."  Kornfeld Decl. at ¶ 4 (emphasis added).  Based on these statements, the court questions whether

---

[2]The court notes that PG Alaska filed each of the declarations that the court relies on in this motion in support of their June 2005 opposition to Mr. Maring's unsuccessful summary judgment motion.  PG Alaska has relied solely on the June 2005 declarations (and a brief excerpt of Mr. Calvert's deposition) in opposing the instant motion.

ORDER – 5

anyone at PG Alaska believed that Mr. Maring had a PQS permit.  Nonetheless, the court will credit the inference that PG Alaska believed that Mr. Maring either had the PQS permit, or that he qualified for one and would obtain one.

The same PG Alaska representatives, however, make clear that they did not rely on Mr. Calvert in concluding that Mr. Maring had a PQS permit or qualified for one. Instead, they relied on Mr. Maring's representations.  Mr. Paduano stated that "Maring represented that the Northland met the qualifications of this regulation specifically crafted for the Northland," and that "PG relied on such representations."  Paduano Decl. ¶ 32. He relied on Mr. "Calvert's analysis," but he relied on Mr. "Maring's promises regarding the Northland's fishing history" that qualified him for the PQS permit.  Id. at ¶ 33; see also id. at ¶ 36 ("Maring always represented the Northland PQS was obtainable or had been obtained.").  Mr. Greenberg concurs.  Greenberg Decl. at ¶ 7 ("PG further relied on Mr. Maring's representation that the Northland qualified for a 'grandfathered' processor quota share permit . . .").  Mr. Kornfeld states that "[b]ased on Mr. Maring's previous statements to PG's principals, both oral and written, it was made clear that [the NORTHLAND] was qualified to obtain a [PQS] permit."  Kornfeld Decl. at ¶ 4.

**C.  Even if PG Alaska Had Relied on Mr. Calvert, Its Reliance Would Have Been Unreasonable.**

Even if PG Alaska had relied on Mr. Calvert in concluding that Mr. Maring had the PQS permit or qualified for one, its representatives reveal that it would not have been reasonable for them to do so.  All PG Alaska representatives clearly understood that Mr. Calvert had no expertise in commercial fishing, and that it was Mr. Maring and Mr. Graves who supplied that expertise.  Mr. Paduano described Mr. Calvert as a man with "professional business training," whereas he described Mr. Maring as a man with "decades long experience as a professional commercial fisherman," and Mr. Graves as

ORDER – 6

"an expert retained by Maring to value the fishing permits." Paduano Decl. at ¶ 28. Mr. Paduano states that he "had no reason not to rely on Mr. Graves's expertise," because Mr. Paduano, unlike Mr. Graves, "was not an expert in the valuation of fishing permits." Id. Similarly, Mr. Greenberg thought Mr. Graves was "an expert in valuing fishing permits." Greenberg Decl. at ¶ 5. He also admits that Mr. Calvert has advised him and Mr. Paduano "that his analysis with respect to Maring's fishing permits was based on discussions with" Mr. Graves. Greenberg Decl. at ¶ 5. Mr. Kornfeld described Mr. Calvert as a "financial advisor," Kornfeld Decl. at ¶ 3, and stated that he understood that the valuation of the Northland PQS "had been completed by Ron Graves, a well-known fishing vessel broker in the Seattle area."[3] Id. at ¶ 4. At most, PG Alaska relied on Mr. Calvert to incorporate information from Mr. Maring and Mr. Graves about the Northland PQS into a consolidated estimate of the value of Mr. Maring's enterprises. They did not rely on him when they concluded that Mr. Maring had a PQS or could obtain one, and they knew it would not be reasonable for them to do so.

The evidence demonstrates that every PG Alaska representative relied on Mr. Graves and Mr. Maring, not Mr. Calvert, in determining that the Northland PQS had a value of at least $500,000. Even if they had relied on Mr. Calvert, their reliance would have been unreasonable. PG Alaska therefore cannot, as a matter of law, prove its counterclaims for fraud and negligent misrepresentation against Mr. Calvert and CCG.

---

[3]Although the court bases its findings on the admissions of PG Alaska representatives, it notes that their express understanding of Mr. Calvert's lack of qualification in valuing vessels and permits is consistent with Mr. Calvert's repeated disclaimers to them. E.g., Calvert Decl. Ex. D (stating in an e-mail to Mr. Paduano that "[I] think we need to have experts, that know the value of boats and fishing licenses."). Even in the draft analysis on which PG Alaska claims to have relied, Mr. Graves disclosed that all "[v]aluations [were] obtained by a 3rd party industry vessel/permit broker," and that the broker was "Ron Graves of GSI, Seattle based vessel and permit broker." Id. Ex. E.

ORDER – 7

**IV.  CONCLUSION**

For the reasons stated above, the court GRANTS Mr. Calvert's motion for summary judgment (Dkt. # 64).  The clerk is directed to dismiss Mr. Calvert and Cascade Capital Group, LLC as parties in this action.

Dated this 10th day of February, 2006.

_____
JAMES L. ROBART
United States District Judge

ORDER – 8