1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MARK MARING, et al.,

                    Plaintiffs,

          v.

PG ALASKA CRAB INVESTMENT CO.,
LLC, et al.,

                    Defendants.

CASE NO. C05-326JLR

ORDER

## I.  INTRODUCTION

This matter comes before the court on a motion for summary judgment from Plaintiff Mark Maring and a collection of Plaintiff entities that he controls (collectively "Mr. Maring") (Dkt. # 118); a motion for summary judgment from Defendant PG Alaska Crab Investment Co., LLC ("PGA") (Dkt. # 116); a motion for summary judgment from Defendants James Paduano and Charles Greenberg (Dkt. # 121); and a motion for summary judgment from Padili, LLC ("Padili"), which is pending in a related case, (Case No. C06-79JLR, Dkt. # 7).  No party has requested oral argument, and the court finds these motions suitable for disposition on the basis of the parties' briefing and accompanying declarations.  For the reasons stated below, the court DENIES the motions from Mr. Maring and PGA, but GRANTS the remaining motions.

ORDER – 1

## II.  BACKGROUND

PGA loaned Mr. Maring millions of dollars to finance his commercial fishing ventures.  Mr. Maring defaulted on the loans.  In 2004, the parties attempted to negotiate a settlement of Mr. Maring's debts.  Those attempts led to a meeting of all parties on January 7, 2005.  As a result, on January 11, 2005, the parties entered an "Agreement of Material Terms and Conditions" ("Agreement") that charted a course toward settling Mr. Maring's debts.  The parties foundered along the course, and Mr. Maring's debts are still outstanding.  Each side accuses the other of breaching the Agreement.  In addition, PGA claims that Mr. Maring either fraudulently or negligently induced it to enter the Agreement by misrepresenting the value of a large asset – the expectancy of obtaining a "PQS," a type of crab fishing permit, for one of his vessels.

Padili, an entity that PGA's principals also control, has filed a separate action (Case No. C06-79JLR) against Mr. Maring to recover on his personal guaranty of a loan to one of his fishing enterprises.  The court has designated that action as related to this one.

Mr. Maring and PGA have filed cross-motions for disposition of their claims and the claims pending against them.  In addition, Padili has filed a motion for summary judgment on its claim in the related case.  Mr. Paduano and Mr. Greenberg have filed a motion to dispose of Mr. Maring's attempt to pierce the PGA corporate veil to hold them personally liable for PGA's obligations.

## III.  ANALYSIS

In examining these summary judgment motions, the court must draw all inferences from the admissible evidence in the light most favorable to the non-moving party.  <u>Addisu v. Fred Meyer, Inc.</u>, 198 F.3d 1130, 1134 (9th Cir. 2000).  Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to

ORDER – 2

judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden to demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met its burden, the opposing party must show that there is a genuine issue of fact.  Matsushita Elect. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  The opposing party must present significant and probative evidence to support its claim or defense.  Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).  For purely legal questions, summary judgment is appropriate without deference to the non-moving party.

**A.    Disputed Facts Prevent the Court from Resolving PGA's Fraud and Negligent Misrepresentation Counterclaims.**

For the second time, Mr. Maring moves for summary judgment against PGA's fraud and negligent misrepresentation counterclaims.  For the second time, the court holds that disputed issues of material fact prevent summary judgment.  The court notes that PGA bears the burden of proving each of these claims by clear and convincing evidence.[1]  Nonetheless, PGA has presented evidence from which a jury could conclude that it has met its burden.

As to PGA's fraud claim, the court's review of the evidence shows that a jury could find that Mr. Maring and persons acting at his direction represented that his vessel (the NORTHLAND) qualified for a PQS permit and would obtain one.  Mr. Maring's attempt to recast his representations as mere opinions or predictions is insufficient to obtain summary judgment, as is his attempt to claim that persons representing him during the January 7, 2005 settlement talks were not speaking on his behalf.  A jury could find that misrepresentations about the value of Mr. Maring's most significant asset were

---

[1]In a prior order (Dkt. # 73), the court set forth the elements of claims for fraud and negligent misrepresentation, as well as the burden a party on a party opposing such claims in a summary judgment motion.  The court will not repeat the discussion here.

ORDER – 3

material to PGA's decision to enter the Agreement.  A jury could find that Mr. Maring knew that the Northland would not qualify for the PQS permit when he made representations to the contrary.  A jury could find that Mr. Maring misrepresented his qualifications for a PQS permit to induce PGA's reliance.  A jury could find that PGA did not know that Mr. Maring's representations were incorrect.  A jury could find that PGA justifiably relied on Mr. Maring's representations rather than poring over documents he provided that allegedly disclosed that the NORTHLAND did not qualify for a PQS permit.  A jury could find that the misrepresentations damaged PGA.

Based on the same evidence, a jury could also find Mr. Maring liable for negligent misrepresentation.

**B.**     **Disputed Facts Prevent the Court from Resolving the Parties' Breach of Contract Claims.**

Before considering the facts surrounding the parties' competing claims for breach of the Agreement, the court must resolve two legal questions related to the interpretation of the contract.  The court interpreted portions of the Agreement in a prior order (Dkt. # 35).  It held that the Agreement imposed conditions precedent on Mr. Maring, and that some of PGA's obligations under the Agreement would arise only if Mr. Maring satisfied those conditions.  The court also held, however, that only a material breach of the conditions precedent would excuse PGA's performance.  With its prior holdings in mind, the court turns to the instant issues of contract interpretation.

First, the court holds that paragraph 3.b of the Agreement did not require Mr. Maring to provide fishing permit documentation to PGA by a date certain.  As Mr. Maring notes, the Agreement merely required him to provide the documentation to his own attorney by January 12, 2005 at 5:00 p.m.  Agreement ¶ 3.b.[2]  Although the

---

[2]The court's citations are to the Agreement attached to Mr. Maring's complaint.

ORDER – 4

Agreement ultimately required Mr. Maring's counsel to provide the documentation to PGA Alaska prior to closing, it did not specify when.  Agreement ¶ 3.b (stating that the "documents shall be held by PG Alaska Counsel until closing," but providing no deadline for transmitting the documents to PGA or its counsel).

Second, the court holds that the Agreement did not set a date certain for closing. Many of the parties' obligations under the Agreement arose at closing or prior to closing. The only mention of a closing date, however, is the statement that "[t]he parties contemplate closing to occur on or before January 24, 2005." Agreement ¶ 2.  By contrast, the Agreement unambiguously fixed other deadlines, rather than merely "contemplat[ing]" performance by the deadline.   Agreement ¶ 3.a (requiring delivery of tender of payment documents "on or before 11 a.m., PST, on Wednesday January 12, 2004"), ¶ 3.c (requiring delivery of power of attorney documents "on or before Wednesday, January 12, 2005 at 5:00 p.m., PST").  In this context, the "contemplate[d]" closing date of January 24 is not a deadline, but rather a requirement that the parties work in good faith to close the Agreement by that date.  The Agreement does not equate a failure to close by January 24 with breach.

With these legal questions resolved, neither party can demonstrate breach of the Agreement as a matter of law.  First, even assuming that PGA had proven beyond dispute that Mr. Maring did not deliver to his attorney all of the documentation that paragraph 3.b required by January 12, 2005, a jury must decide if this breach is material.  Because PGA did not impose a deadline for transmitting the documents to its counsel, it strains reason to assert that Mr. Maring *materially* breached the contract by failing to provide the documents to his own counsel.  As the court noted in a prior order (Dkt. # 35), a breach is material only if, among other things, it deprives the injured party of a reasonably expected benefit.  Because PGA required the documentation in paragraph 3.b at an

ORDER – 5

unspecified time before closing, a reasonable jury could find that Mr. Maring's failure to provide the documents to his counsel on January 12, 2005 did not deprive PGA of any expected benefit.  It could also come to the opposite conclusion.

Second, a jury must decide if Mr. Maring *ever* materially breached the Agreement. Mr. Maring contends that the parties continued to work toward closing until PGA had all required documentation on February 9, 2005.  His failure to provide the documentation before the "contemplated" January 24, 2005 closing date is not necessarily a material breach.  There is evidence from which a jury could conclude that the parties rolled back the closing date as they continued to finalize documentation.  Putting aside the timeliness of the documentation, a jury must also decide if the documentation Mr. Maring provided by February 9, 2005 was sufficiently complete to avoid a material breach of the Agreement.  There is evidence from which a jury could conclude that any defects in Mr. Maring's performance as of February 9 were immaterial.  A jury could also find that Mr. Maring had produced at least enough documentation to require PGA to continue working in good faith toward closing.  On the other hand, a jury could find that at some point, PGA was justified in refusing to continue to work toward closing.

A jury, not the court, must decide what conclusions to draw from the parties' conflicting evidence regarding their performance under the Agreement.

**C.    The Agreement Does Not Affect Padili's Right to Enforce Mr. Maring's Personal Guaranty.**

In October 2004, Padili acquired the creditor's rights under a loan to Polmar Fisheries, Inc. ("Polmar"), an entity that Mr. Maring controls, as well as the creditor's rights under Mr. Maring's personal guaranty of the loan.  Paduano Decl., Ex. 2 ("Guaranty").  The security for the loan was a first preferred ship mortgage against the BJAL PAAMIUT, a Polmar vessel.  Paduano Decl., Ex. 1.  It is undisputed that Polmar

ORDER – 6

has defaulted on the loan.  It is also undisputed that Mr. Paduano is the managing member of both Padili and PGA, and that he owns a controlling 95% stake in both entities.

PGA, Mr. Paduano, and Mr. Maring were undisputedly aware of the Guaranty and the underlying loan when they agreed to the following clause in the Agreement:

> Padilli, the holder of a first preferred ship mortgage against the BIAL PAAMUIT[3], shall agree to extend to the Maring Entities an option to purchase the mortgage for $500,000 cash, and Padilli shall forbear foreclosing under the mortgage through the date and time of the option's expiration.  Such option shall remain in effect until April 15, 2004 [sic], at which time it shall automatically and without notice terminate unless payment has been made prior to 5:00 p.m., EST on April 15, 2004 [sic].  Notwithstanding the foregoing, this option shall not, in any way, affect Padilli's right to enforce the mortgage in its full amount, and Padilli does not waive any rights it may have under such mortgage or its rights under any guaranty by Maring or any other entity or individual.

Agreement ¶ 8.

Mr. Maring contends that this clause in the Agreement bars Padili's effort to enforce the Guaranty.  Padili argues that the Agreement does not bind it, and that even if it did, it does not prevent it from enforcing the Guaranty.

The court need not decide whether the Agreement binds Padili.  Assuming that it binds Padili, the Agreement does not prevent it from enforcing the Guaranty.  At most, the Agreement prevents Padili from foreclosing on the mortgage securing the loan underlying the Guaranty.  It expressly does not "waive any rights . . . under any guaranty by Maring."  Agreement ¶ 8.  Under the unforgiving terms of the Guaranty, Mr. Maring has almost no rights.  In entering the Guaranty, he abandoned all defenses to liability, including settlement or compromise of the underlying obligation.  Guaranty ¶¶ 3, 3(c).  The only defense to liability under the Guaranty is "actual payment of the Guaranteed

---

[3]The parties have not used consistent spellings of "Padili" or "BJAL PAAMIUT."  Except where quoting the parties, the court has adopted the spelling of "Padili" found in Padili's complaint in the related action, and the spelling of "BJAL PAAMIUT" found in the Guaranty and the underlying loan.

ORDER – 7

Obligations." Guaranty ¶ 3. Thus, even if the Agreement constituted a settlement of the loan underlying the Guaranty, the settlement would have no impact on Mr. Maring's obligations under the Guaranty.

Mr. Maring presents no basis for avoiding enforcement of the Guaranty. As noted above, the plain language of the Agreement dictates that it does not affect Padili's rights under the Guaranty.[4] It merely prevents Padili from foreclosing on the mortgage against the BJAL PAAMIUT. Mr. Maring asserts that a promise not to foreclose the ship mortgage would be "meaningless" if Padili could enforce the Guaranty. Mr. Maring fails to recognize that an agreement not to foreclose on the BJAL PAAMIUT has value independent from an agreement not to enforce his personal obligation. Under the Agreement, the BJAL PAAMIUT would have been safe from foreclosure, at least for several months, and Mr. Maring retained the possibility of purchasing the ship. That Mr. Maring himself continued to face liability is not inconsistent with the terms of the Agreement.

Although Mr. Maring discusses the possibility of an oral modification to the Guaranty, he presents no evidence that such a modification occurred. At best, he asserts that he "understood" that Padili would not enforce the Guaranty while the mortgage option was open, or that there was a "tacit" or "implied" obligation not to enforce the Guaranty during the option period. These assertions fail for at least two reasons.

First, Mr. Maring has adduced no evidence to support his understanding of a tacit or implied obligation not to enforce the Guaranty. For that reason, his contention that a

---

[4] Mr. Maring contends that the Agreement is ambiguous as to the Guaranty, an assertion at odds with the unambiguous language of the Agreement. Mr. Maring also argues that the parties' *intent* is ambiguous as to the Guaranty, but this is not relevant. See Hearst Comms., Inc. v. Seattle Times Co., 115 P.3d 262, 267 (Wash. 2005) (directing courts to interpret "what was written" rather than "what was intended to be written").

ORDER – 8

jury must consider the extrinsic evidence surrounding the Agreement's effect on the Guaranty is unavailing.  A jury cannot consider evidence that does not exist.  Even if there were extrinsic evidence bearing on the enforcement of the Guaranty, it would be admissible only "'to determine the meaning of specific words and terms used' and not to 'show an intention independent of the instrument' or to 'vary, contradict, or modify the written word.'"  Hearst Comms., Inc. v. Seattle Times Co., 115 P.3d 262, 267 (Wash. 2005) (quoting Hollis v. Garwall, Inc., 974 P.2d 836, 843 (Wash. 1999)) (emphasis in Hearst).  The Agreement unambiguously left Mr. Maring subject to the Guaranty, and under the harsh terms of the Guaranty, he has no defense to liability.

Second, even if the Agreement somehow suspended Padili's right to enforce the Guaranty during the option period, Mr. Maring fails to explain why it continues to suspend Padili's rights today, more than a year after the option period expired.  The Agreement provided for an option period, and a concomitant period of mortgage forbearance, to end on April 15, 2005.[5]  Agreement ¶ 8.  Other than a generalized plea for "equity and fairness," Maring Opp'n at 7, Mr. Maring offers no basis for extending the forbearance period for more than a year beyond the period for which the parties bargained.

For these reasons, the court holds that Padili may enforce the Guaranty, and that Mr. Maring is liable under the Guaranty as a matter of law.  Padili has presented uncontroverted evidence that as of March 28, 2006, the outstanding principal on the obligation underlying the Guaranty was $725,000; and an additional $362,500 in unpaid

---

[5]As the court previously noted, the Agreement actually provides that the option period ends on April 15, 2004, or many months before the parties drafted the Agreement.  For purposes of this order, the court assumes, consistent with the parties' pleadings, that they intended April 15, 2005 to be the option expiration date.

ORDER – 9

interest had accrued.  Paduano Decl. ¶ 7.  Under the terms of the Guaranty, interest accrues at the rate of 12.5% per year, or $248.29 per day.

**D.      Mr. Maring Has Not Produced Evidence Sufficient to Carry His Veil-Piercing Theory to Trial.**

Finally, the court turns to the contention of Mr. Paduano and Mr. Greenberg that Mr. Maring may not, as a matter of law, pierce the PGA corporate veil to hold them personally liable in this action.

The threshold question is which state's law applies to Mr. Maring's veil-piercing contentions.  Although this action arises from contracts negotiated in Washington, PGA is incorporated in Delaware.  The court noted this choice of law issue in a prior order, but neither party has provided a choice of law analysis.  PGA has vacillated between Washington law and Delaware law without explanation.  Mr. Maring "believe[s] that Washington law likely controls," Maring 2d Opp'n at 9 n.2, but he does not provide any authority for the proposition.

The court applies Washington law as it relates to piercing the corporate veil.  A federal court exercising diversity jurisdiction "must look to the forum state's choice of law rules to determine the controlling substantive law."  Patton v. Cox, 276 F.3d 493, 495 (9th Cir. 2002).  Washington courts apply Washington law unless it conflicts with another potentially applicable body of law.  Cox v. Lewiston Grain Growers, Inc., 936 P.2d 1191, 1195 (Wash. Ct. App. 1997).  The parties have not identified any conflict between Washington and Delaware law as it relates to piercing the corporate veil, and the court is not aware of one.

Under Washington law, LLC members become personally liable for corporate obligations only when the "corporation has been intentionally used to violate or evade a duty owed to another."  Meisel v. M & N Modern Hydraulic Press Co., 645 P.2d 689,

ORDER – 10

692 (Wash. 1982) (quoting Morgan v. Burks, 611 P.2d 751, 755 (1980)); see also RCW § 25.15.060 (providing that LLC members are liable for corporate obligations to the same extent as corporate shareholders). The following "essential factors" are necessary to pierce the veil: "[f]irst, the corporate form must be intentionally used to violate or evade a duty; second, disregard must be necessary and required to prevent unjustified loss to the injured party." Meisel, 645 P.2d at 692 (internal quotation omitted). The burden of proof is on the party seeking to pierce the veil. Minton v. Ralston Purina Co., 47 P.3d 556, 562 (Wash. 2002).

Mr. Maring cannot establish that either Mr. Greenberg or Mr. Paduano abused the corporate form. PGA formed in 2003 as a reorganization of a partnership that had loaned money to Mr. Maring. Although PGA admittedly chose the LLC form to limit the liability of its members, this is precisely why the LLC form is available. As the Meisel court noted, "[t]he purpose of a corporation is to limit liability," and a litigant is "hard put" to argue that choosing to incorporate for that purpose is misconduct. 645 P.2d at 693. Mr. Maring has no evidence that, in 2003, Mr. Paduano and Mr. Greenberg foresaw the instant dispute and chose the LLC form as a means of avoiding a duty to him.

The court also finds no abuse of the corporate form arising from Mr. Paduano's nearly unilateral control of PGA. A corporation can have a single shareholder, with sole power for all corporate decisions, without exposing the shareholder to liability. Truckweld Equip. Co. v. Olson, 618 P.2d 1017, 1021 (Wash. Ct. App. 1980). Mr. Maring presents some evidence that Mr. Paduano has not observed all corporate formalities in governing PGA, but he presents no evidence that these failures have harmed him, or otherwise warrant piercing the corporate veil.

Mr. Maring's only allegation of abuse of the corporate form with respect to this dispute is that, upon receiving more than seven million dollars in "Buy Back" proceeds

ORDER – 11

from the National Marine Fisheries Service ("NMFS"), PGA distributed those funds to its members.  The Agreement, however, gave PGA an nearly unfettered right to these proceeds.  Agreement ¶ 2 ("[T]here shall be no conditions imposed with respect to the automatic authority of [PGA] to deliver the Irrevocable Tender Documents to NMFS"), ¶ 3.a ("[PGA] is authorized, without condition, to deliver the Irrevocable Tender Documents to NMFS immediately.").  PGA's only obligation was to pay Mr. Maring $275,000 of the proceeds at closing.  Agreement ¶ 5.  At the time PGA distributed the proceeds to its members, it is undisputed that it retained more than $275,000 in cash.  There is therefore no evidence that PGA abused the corporate form in distributing the "Buy Back" proceeds.

As to the second veil-piercing factor, Mr. Maring has adduced no evidence that imposing personal liability on Mr. Paduano and Mr. Greenberg is necessary to avoid an unjustified loss.  Since PGA distributed the "Buy Back" proceeds, its assets have diminished.  It now holds approximately $160,000 in cash.  Greenberg Decl. ¶ 6.   On this evidence, a jury could find that PGA's assets are insufficient to compensate Mr. Maring in the event he prevails on his claims.  There is no evidence, however, from which a jury could conclude that PGA lacked a legitimate business purpose for depleting those funds.  The court provided Mr. Maring with an opportunity to conduct additional discovery into its allegations of corporate abuse.  That opportunity yielded no evidence that PGA has depleted its assets to avoid its obligation to Mr. Maring.  Absent such evidence, no reasonable jury could infer that PGA has wrongfully depleted its assets.

## IV.  CONCLUSION

For the reasons stated above, the court DENIES PGA's motion (Dkt. # 116) and Mr. Maring's motion (Dkt. # 118).  The court GRANTS Padili's motion for summary judgment (Case No. C06-79JLR, Dkt. # 7), and directs the clerk to enter a minute order in

ORDER – 12

that action reflecting this result, and to enter judgment in that action. The court GRANTS the individual Defendants' motion for summary judgment (Dkt. # 121), and directs the clerk to terminate Mr. Greenberg and Mr. Paduano from this action.

Trial in this action shall commence at 1:30 p.m. on August 21, 2006. The court allocates seven court days for trial. The parties will appear for a pretrial conference on August 8, 2006 at 2:00 p.m. The parties shall file their joint pretrial order, designations of deposition testimony, and motions in limine no later than July 28, 2006. Motions in limine shall be noted for consideration no later than August 11, 2006. Trial briefs, proposed voir dire, trial exhibits, and proposed jury instructions are due no later than August 14, 2006. The court directs the parties to adhere to the requirements of Local Rules W.D. Wash. CR 32(d) and CR 51 when submitting deposition testimony and jury instructions.

Dated this 11th day of July, 2006.

JAMES L. ROBART
United States District Judge

ORDER – 13